IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 4, 2008

## STATE OF TENNESSEE v. JASON MALONE and HAROLD ROBINSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-00678      W. Mark Ward, Judge**

---

**No. W2007-00954-CCA-R3-CD  - Filed June 12, 2009**

---

Defendants Jason Malone and Harold Robinson, along with co-Defendant Johnny Miller, were indicted and tried jointly for aggravated robbery and aggravated burglary. Defendant Miller's case is not part of this appeal. Following the jury trial, Defendant Malone was found guilty of aggravated robbery, a Class B felony, in count one of the indictment, and the lesser included offense of criminal trespass, a Class C misdemeanor, in count two. Defendant Robinson was found guilty of aggravated robbery in count one, and not guilty of aggravated burglary in count two. The trial court sentenced Defendant Malone as a Range II, multiple offender, to nineteen years for his aggravated robbery conviction, and to a concurrent sentence of thirty days for his criminal trespass conviction. The trial court sentenced Defendant Robinson to sixteen years for his aggravated robbery conviction. In their appeal, Defendant Malone and Defendant Robinson challenge the sufficiency of the convicting evidence. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Larry E. Fitzgerald, Memphis, Tennessee, for Appellant Harold Robinson; Robert Wilson Jones, District Public Defender; Garland Ergüden, Assistant Public Defender (on appeal); and Brent Walker, Assistant Public Defender (at trial), Memphis, Tennessee, for the appellant, Jason Malone.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; William L. Gibbons, District Attorney General; Paul Hagerman, Assistant District Attorney General; and Scot Bearup, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Charles Barnett, the victim, testified that as a result of the sequence of events leading up to the charged offenses, he entered a plea of guilty to a federal charge of conspiracy to distribute cocaine. The victim stated that he had been a drug dealer since 1993, but first started selling cocaine in May 2005. At that time, the victim acquired two kilos of cocaine, and each kilo was worth between $18,000 and $20,000 dollars. The victim said that he kept the kilos of cocaine at his house and sold some of the cocaine to three different individuals. The individuals came to the victim's house to make their purchases. The victim also gave small quantities of the cocaine to friends.

The victim said that someone knocked on his front door around 9:00 a.m., on October 26, 2005. The steel front door was locked, and a man was standing on the other side of the door. The man told the victim that he had run out of gas, and he pointed toward an older, gray Chevrolet parked on the entrance ramp to Sam Cooper Boulevard. The victim told the man that he did not have a gasoline can but that he would give him some plastic cups. The victim stated that when he opened the door to hand the man the red plastic cups, the man pointed a gun at him, and he and two other individuals entered the victim's house. The victim identified Defendant Malone at trial as the man with the gun.

The victim said one of the men hit him in the head with an ashtray, almost knocking him unconscious. One man began kicking the victim, while another yelled "go ahead and cap him." The victim heard Defendant Malone refuse to shoot the victim because he did not "want the charge." The victim said that the other two men had stockings pulled down over their faces, but the victim could make out the men's facial features. The victim identified Defendant Miller and Defendant Robinson at trial as Defendant Malone's companions during the offenses.

The victim said that the three men dragged him to his bedroom as they looked for money, jewelry, and drugs. They began beating him again. One of the men overturned an armoire on to the victim's bed. The victim said that he usually kept money beneath the armoire, but there was no money there that day. The victim gave one man his wallet while another grabbed his watch from the dresser. The victim heard someone say, "Cap him, he ain't going to tell us." The victim then disclosed that the cocaine was located in a green ammunition container and hidden in a hallway closet beneath the furnace's filter. The men left after retrieving the drugs and grabbed the victim's car keys on their way out.

The victim grabbed an antique 1905 12-gauge shotgun which was kept beneath his bed and ran into his front yard. The men had gotten into the gray Chevrolet parked on the entrance ramp. The victim yelled at the men and then heard gunshots coming from the vehicle. The victim ducked behind a tree and fired two shots into the vehicle's windows. The victim said that he believed that he hit at least one of the men. The victim heard two or three more gunshots, and then he ran into his house and called the police.

The victim said that the stolen cocaine was worth approximately $30,000, and the watch was valued at $1,500. The victim believed that he had approximately $100 in his wallet along with various credit cards. The investigating officers returned the victim's car keys to him. The victim testified that he was afraid for his life during the incident.

On cross-examination, the victim acknowledged that he had three prior drug convictions for possession of marijuana, Ecstasy and Xanax, and that he had been granted probation for these offenses. The victim said that he had never sold cocaine before May 2005. The victim explained that the cocaine was given to him as collateral for unpaid rentals of sound equipment. The victim said that the cocaine's owner intended to repay his outstanding debt when he located a buyer for the cocaine. In the meantime, the owner told the victim that the victim could sell some of the cocaine if he found a buyer. The victim said he gave the sales proceeds to the owner of the drugs, but then acknowledged that he may have kept some of the money.

The victim acknowledged that he testified at the preliminary hearing that his steel door was unlocked when Defendant Malone knocked. The victim said that he did not invite Defendant Malone into his house. The victim opened the steel door so that he could hand Defendant Malone the plastic cups. The victim denied that he knew his assailants or that he had previously sold drugs to them.

Officer Marcus Collins with the Memphis Police Department responded to a call of shots fired at the victim's home. Officer Collins said that when he arrived, the victim had a swollen forehead and was shaking and nervous. Officer Collins observed a light colored car parked on the interstate ramp near the victim's house.

On cross-examination, Officer Collins said that it appeared that a scuffle had taken place in the victim's living room and bedroom. A live shell casing was found on the living room floor.

Charles Cathey with the Memphis Police Department's crime scene unit, testified that he discovered what appeared to be a bullet hole in a shutter on the front of the victim's house, and he recovered a bullet fragment from the ground beneath the shutter. An empty red plastic cup was sitting on top of the mailbox next to the front door. Another red plastic cup was found in the living room along with two spent shell casings, a broken clay ashtray, and a telephone cord lying in the middle of the room.

Officer Cathey stated that it appeared that the victim's bedroom had been ransacked. A drawer had been removed from one of the chest of drawers, and a second chest of drawers was thrown across the bed. A window pane had been removed from the outside of a bedroom window. Officer Cathey said that the car abandoned on the entrance ramp to Sam Cooper Boulevard was visible from the victim's front door. A hole was in the chain link fence separating Sam Cooper Boulevard from the victim's street.

On cross-examination, Officer Cathey stated that he dusted the red plastic cups and the inside of the storm door for fingerprints. Only the victim's fingerprints were found on the cups. Officer Cathey said that he photographed a bruise above the victim's right eye and bruises on his knees. Officer Cathey testified that he could not determine how long the bullet fragment had been lying on the ground in front of the victim's house. Another police officer told Officer Cathey that the victim had brought the shell casings from outside into the living room. Officer Cathey confirmed that the only shell casings found at the victim's house were fired from a shotgun. The investigating officers did not find any blood inside the victim's house.

Officer Kay Turnmire with the Memphis Police Department's crime scene unit processed the vehicle found on the entrance ramp to Sam Cooper Boulevard. Officer Turnmire said that the vehicle's side passenger windows had been shattered by gunshot. In addition, five bullet holes were located in the vehicle's front window on the passenger side. Officer Turnmire recovered four 40-caliber Winchester shell casings inside the vehicle and two in a grassy area next to the vehicle. Blood spatter was discovered on the green ammunition container located between the passenger and driver side of the vehicle and on the upholstery of the vehicle's front seat. A set of car keys found inside the vehicle was returned to the victim. A pair of rubber gloves was also found in the vehicle. Officer Turnmire said that a white powdery substance was found inside the ammunition case which later was determined to be cocaine. The cocaine was divided between one brick, two large baggies and several smaller baggies. Officer Turnmire also found a small bag containing what appeared to be marijuana and twelve dollars in cash. The vehicles's certificate of registration listed Cornelius Norman as the owner of the vehicle.

Officer Turnmire stated that when she finished processing the crime scene around the vehicle, she walked toward the victim's house. Officer Turnmire observed that the chain link fence separating the victim's road from Sam Cooper Boulevard had been cut in a couple of places, large enough for an individual to pass through.

On cross-examination, Officer Turnmire acknowledged that she could not determine when the chain link fence had been cut, and she did not find any bolt cutters in the vehicle. Officer Turnmire stated that she did not dust the vehicle for fingerprints because of the presence of oxidation on the outside of the vehicle. Officer Turnmire confirmed that the vehicle's hood was opened slightly when she arrived to conduct her investigation. Officer Turnmire said that she did not mention the victim's car keys or the rubber gloves in her report.

Cornelius Norman testified that he got word that the Memphis Police Department was looking for him because his vehicle had been found at the scene of a robbery. Mr. Norman stated that he did not own the vehicle at the time of the offenses because he had traded vehicles with his cousin, Defendant Malone. Mr. Norman identified the vehicle found on the entrance ramp to Sam Cooper Boulevard as the one he traded to Defendant Malone. Mr. Norman said that the vehicle did not have any bullet holes in it when he traded it to Defendant Malone.

Officer Laneeze Stepney and other officers with the Memphis Police Department were dispatched to arrest Defendant Robinson on October 28, 2005. Officer Stepney arranged for someone in the neighborhood to knock on Defendant Robinson's door. When Defendant Robinson answered the door, the man left. Defendant Robinson then walked outside, and the police officers ordered him to the ground. Officer Stepney said that Defendant Robinson complied with the order. A black stocking cap was found in Defendant Robinson's right front pocket during a search of his person. Officer Stepney also detected a series of small holes on the right side of his torso and one hole on the right side of his face which were consistent with injuries from shotgun pellets. Defendant Robinson initially provided a different name, but his identity was confirmed by the identification in his wallet.

On cross-examination, Officer Stepney acknowledged that the stocking cap, known as a "wave" cap, was frequently worn in Defendant Robinson's neighborhood and covered only the wearer's hair. Officer Stepney stated that the house was leased to Defendant Robinson's girlfriend, Sametra Hudson.

Ms. Hudson signed a consent form for the police officers to search her residence. Officer Scott Karcher with the Memphis Police Department testified that a search of the residence revealed a box of .40 caliber Winchester ammunition in a shoe box in a closet. A box of this type of ammunition usually contained fifty rounds, and there were thirty-seven rounds of ammunition in the box. On cross-examination, Officer Karcher stated that the officers did not find a weapon in the house.

Matthew Gunnell testified that in 2005 he was a student at Southwest Tennessee Community College. On October 26, 2005, Mr. Gunnell returned home from class between 10:30 a.m. and 10:45 a.m. As he exited Sam Cooper Boulevard, he noticed an older, gray car parked by the side of the road and surrounded by two patrol cars. Mr. Gunnell said that he drove to his residence which was located past Graham Street and pulled into his carport. An African-American man approached him and asked for help. Mr. Gunnell identified Defendant Robinson as the man who approached him that morning. Mr. Gunnell said that Defendant Robinson had a shotgun wound to his face and was bleeding. Mr. Gunnell told Defendant Robinson that he needed to call the police, and Defendant Robinson said, "No, don't worry about it." Defendant Robinson told Mr. Gunnell that he had gotten into a fight with his brother, and his brother had shot him.

Mr. Gunnell said that Defendant Robinson got into his vehicle without permission, so Mr. Gunnell backed out of his driveway and began driving toward Summer. Defendant Robinson had his shirt off and was pressing the shirt against his facial wound. Mr. Gunnell said that Defendant Robinson kept looking around as they drove. Mr. Gunnell said that he was very nervous during the drive because approximately four patrol cars with their emergency lights activated passed Mr. Gunnell's vehicle, and a helicopter was hovering above his vehicle. After driving through neighborhoods for approximately ten minutes, Mr. Gunnell stopped at a stop sign. Defendant Robinson jumped out of the vehicle and got into a vehicle parked at the intersection. Defendant Robinson gave Mr. Gunnell approximately fifty dollars.

Mr. Gunnell said that he called his parents when he returned home, and they told him to call the police. The dispatcher told Mr. Gunnell that police officers were in the neighborhood, so Mr. Gunnell approached one of the police officers and told him about the man who needed a ride. Mr. Gunnell identified Defendant Robinson from a photographic lineup.

On cross-examination, Mr. Gunnell said that he did not see a gun on Defendant Robinson and acknowledged that Defendant Robinson did not threaten him. Mr. Gunnell also did not see a black stocking cap.

Officer Christopher Triplett with the Memphis Police Department was dispatched to look for three African-American suspects shortly after the commission of the offenses against the victim. Officer Triplett said that he saw an African-American man walking approximately one-fourth of a mile from the victim's residence at approximately 10:43 a.m. Officer Triplett observed that the man had pine needles and briars all over himself, and Officer Triplett asked the man what he was doing. The man told Officer Triplett that he was returning to his home at 3182 Walnut Grove. Officer Triplett said that he drove the man back to the victim's residence and then to the police station. Officer Triplett identified Defendant Miller as the person he escorted to the police station. On cross-examination, Officer Triplett said that the victim was not able to identify Defendant Miller by his facial features when Defendant Miller was returned to the victim's house, but the victim said that he recognized Defendant Miller's pants and shoes.

The State rested its case-in-chief, and Defendant Robinson and Defendant Miller elected not to testify. Defendant Malone, however, did testify. Defendant Malone said that he traded a Cadillac for the gray Chevrolet about a week before the offenses. Defendant Malone said that he intended to repair the Chevrolet and then sell it. Defendant Malone said that he had previously bought drugs from the victim on four or five occasions, and Defendant Malone was one of the three buyers described by the victim during his direct examination. Defendant Malone said that he bought powder cocaine from the victim at the victim's house.

On October 26, 2005, Defendant Malone dropped his wife and her cousin off at work in the gray Chevrolet and then drove to the corner of Tillman and Johnson. Defendant Malone joined a group of approximately ten men who were standing around talking, smoking marijuana, and drinking beer. Defendant Malone said that he struck up a conversation with Defendant Robinson, and then Defendant Miller walked up. Defendant Malone suggested that the three of them go riding in his vehicle. Defendant Malone said that he had not gotten the effect he wanted from smoking the marijuana, so he decided to buy some cocaine from the victim.

Defendant Malone said that he parked the Chevrolet on the entrance ramp to Sam Cooper Boulevard with the hood slightly raised and the hazard lights on. Defendant Malone crawled through a hole in the chain link fence to get to the victim's house. Defendant Malone said that Defendant Robinson and Defendant Miller stayed in the car while he went to purchase the cocaine. Defendant Malone said that he knocked on the victim's front door, and the victim let him in. Defendant Malone gave the victim twenty dollars for the cocaine. Defendant Malone said that the cocaine was in a

green box on a coffee table in the living room. The victim left the living room to retrieve a set of scales, and Defendant Malone said that he "snatched the drugs from the coffee table." Defendant Malone said that he was not armed. Defendant Malone said that he only intended to steal the cocaine and whatever other drugs were in the box.

Defendant Malone said that he started for the front door when the victim jumped on his back, and they began to fight. Defendant Malone managed to get away and ran toward the front door with the box while the victim ran toward the back of the house. Defendant Malone crawled back through the hole in the chain link fence and ran toward the car. Defendant Malone said that he shut the hood and started to get into his car when he heard two loud shots from a shotgun. Defendant Malone ran across Sam Cooper Boulevard and through some backyards. Defendant Malone said that he was afraid for his life. Defendant Malone hid in someone's shed until approximately 10:00 p.m. He later turned himself in to the police after he saw his photograph on a televised news program.

Defendant Malone said that he had never been in the victim's bedroom. Defendant Malone stated that he was not aware that any shell casings or rubber gloves were in his vehicle. Defendant Malone denied taking the victim's keys or any money from him.

On cross-examination, Defendant Malone acknowledged that he had identified Defendant Robinson and Defendant Miller from a photographic lineup as his companions on the day of the incident. Defendant Malone denied that any of the men in his car were armed, but he acknowledged that the front window of his vehicle did not have any bullet holes prior to the incident. Defendant Malone then clarified that he did not know if either Defendant Robinson or Defendant Miller had a gun. Defendant Malone acknowledged that he told the investigating officers that he got his twenty dollars worth of cocaine before stealing the box.

## II. Sufficiency of the Evidence

Defendant Malone argues that the victim's testimony "was filled with inconsistencies." Defendant Malone points out that the victim said that he could not see the other two men when he opened his front door although Officer Cathey testified that nothing impeded the view of the victim's front porch from the front door. The victim denied that he knew his assailants or that he had sold drugs to any of them "despite the fact that [Defendant Malone] took a unique path to a supposedly unknown house where he was lucky enough to stumble across [one and one-half] kilos of cocaine." The victim testified on direct examination that he could immediately identify all three of his assailants despite two of them wearing stocking masks. Officer Triplett, however, testified that the victim could only identify Defendant Miller by his pants and shoes when Defendant Miller was taken to the victim's house shortly after the incident. Defendant Malone points out that no fingerprints other than the victim's were found on any items.

Defendant Robinson argues that Defendant Malone's testimony clearly placed him in Defendant Malone's vehicle at the time of the incident, and not in the victim's house. Defendant Robinson surmises that the jury must have credited this portion of Defendant Malone's testimony

-7-

because he was acquitted of the aggravated burglary charge. Defendant Robinson contends, therefore, that the jury failed to follow the trial court's instruction that "to fully satisfy the mind it must rest easy to the conclusion reached or be satisfied of its truth beyond a reasonable doubt."

In reviewing Defendants' challenge to the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crimes beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Defendant Malone and Defendant Robinson were both convicted of the offense of aggravated robbery which, as relevant here, is defined as a "robbery as defined in § 39-13-401 . . . accomplished with a deadly weapon." T.C.A. § 39-13-402. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401.

Defendant Malone was also convicted of criminal trespass. "A person commits criminal trespass who, knowing the person does not have the owner's effective consent to do so, enters or remains on property, or a portion thereof." Id. § 39-14-405(a). For purposes of the offense of criminal trespass, "'enter' means intrusion of the entire body." Id. § 39-14-405(c).

The victim testified that Defendant Malone knocked on his front door at approximately 9:00 a.m. on October 26, 2005, and asked for a gasoline can. When the victim opened the door to hand Defendant Malone a red plastic cup, Defendant Malone pushed his way into the house without the victim's consent, armed with a gun, and followed by Defendant Miller and Defendant Robinson. One of the men hit the victim in the head with an ashtray and began kicking him. The victim testified that his assailants dragged him into his bedroom, demanding drugs, money, and jewelry. One of the men overturned his armoire, and the victim handed one of the assailants his wallet while another grabbed his watch from a dresser. When one of the assailants told Defendant Malone to shoot the victim, the victim told them where the cocaine was located. The men grabbed the can in which the drugs were stored and left the victim's house. The victim identified Defendant Malone, Defendant Miller, and Defendant Robinson at trial as his assailants.

The jury heard Defendant Malone's explanation for the incident, including his denials that he was armed, that he ransacked the victim's bedroom, and that he stole anything other than the drugs, and his testimony that Defendant Miller and Defendant Robinson were in his vehicle while Defendant Malone stole the victim's cocaine. It is the jury's function to evaluate the credibility of witnesses and resolve any conflicts in the evidence presented at trial. Based on their verdict, the jury obviously credited the victim's testimony that Defendant Malone, Defendant Miller, and Defendant Robinson, entered his house without consent, robbed him of his watch, wallet, and drugs, and that Defendant Malone held a gun on the victim during the robbery. After a thorough review of the record, we conclude that a rational trier of fact could find beyond a reasonable doubt that Defendant Malone was guilty of aggravated robbery and criminal trespass, and that Defendant Robinson was guilty of aggravated robbery.

## CONCLUSION

After a thorough review of the record, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE